**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DREW KRANTZ, | No. 4:21-CV-01217 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| SCOTT STEILER and MARKET STREET INVESTMENT CORPORATION, INC., | |
| Defendant. | |

**MEMORANDUM OPINION**

**APRIL 5, 2024**

## I.    BACKGROUND

In May 2021, Plaintiff Drew Krantz visited Adrien Crastes' apartment at 220 South Seventh Street, Lewisburg, Pennsylvania.[1] Krantz and others decided to install a window air conditioning unit in Crastes' window.[2] But when Krantz tried to open the window, the windowpane broke and fell on his wrist, causing the injury which prompted this lawsuit.[3]

In July 2021, Krantz filed a one-count Negligence complaint against Scott Steiler.[4] In December 2021, Krantz amended his complaint and added Market

---

[1]    Memorandum, Doc. 43 at 1-2.
[2]    Defendants' Statement of Undisputed Facts, Doc. 39 ¶5; Krantz Response to Statement of Undisputed Material Facts, Doc. 41 ¶5.
[3]    Defendants' Statement of Undisputed Facts, Doc. 39 ¶¶6-7; Krantz Response to Statement of Undisputed Material Facts, Doc. 41 ¶¶6-7.
[4]    Complaint, Doc. 1.

Street Investment Corporation, Inc. ("Market Street"), which owns the premises, as a defendant.[5] This Court granted Steiler's motion for summary judgment and denied Market Street's in May 2023; Steiler was dismissed from the case.[6] In January 2024, this Court issued a scheduling order setting trial to begin on May 6, 2024.[7]

Market Street and Krantz both filed motions in limine in February 2024.[8] The motions are now ripe for disposition. For the reasons stated below, Krantz's motion is granted in full, and Market Street's motion is granted in part and denied in part.

## II.   LAW

"Motions in limine are made prior to trial or the presentation of evidence in order to aid the clear presentation of evidence."[9] Motions in limine are "designed to narrow the evidentiary issues for trial and eliminate unnecessary trial interruptions."[10]

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. "As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and

---

[5]   Amended Complaint, Doc. 17.
[6]   Order, Doc. 44.
[7]   Scheduling Order, Doc. 58.
[8]   Market Street Investment Corporation Motion in Limine, Doc. 59; Krantz Motion in Limine, Doc. 61.
[9]   *United States v. Ramsey*, No. 19-268, 2021 U.S. Dist. LEXIS 192115, at *1 (E.D. Pa. Oct. 5, 2021).
[10]   *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).

relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact."[11] "The proponent of the expert testimony bears the burden to show by a preponderance of the evidence that their expert's opinion is reliable."[12]

The admissibility of expert testimony is often tested through a so-called *Daubert* hearing, at which experts elaborate upon their methodologies. However, whether a court should hold a *Daubert* hearing "rests in the sound discretion of the district court," and a *Daubert* hearing is not always required.[13] In this matter, the Court will not hold a *Daubert* hearing because "[t]here is a full record before the Court on th[ese] issues including [Brian Krason's] expert report and deposition."[14] Krason has provided sufficient responses in his deposition testimony for this Court to rule upon each of the contested issues presented by these motions in limine.

---

[11] *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993)).

[12] *Whyte v. Stanley Black & Decker, Inc.*, 514 F.Supp. 3d 684, 691 (W.D. Pa. 2021).

[13] *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

[14] *States v. Fernwood Hotel & Resort*, No. 12-0906, 2014 U.S. Dist. LEXIS 4997 (M.D. Pa. Jan. 15, 2014); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (Upholding district court's decision to deny *Daubert* hearing where court "already had before it the depositions and affidavits of the plaintiff's experts.").

## III. ANALYSIS

During discovery, Market Street obtained Drew Krantz's scholastic records from Bucknell, including documents referencing disciplinary action against Krantz.[15] Krantz's motion in limine seeks to preclude any mention of these disciplinary actions.[16] Market Street does not oppose Krantz's motion and consents to Krantz's proposed order precluding it from offering any evidence, or eliciting any testimony, relating to such incidents and disciplinary actions.[17] So Krantz's motion is granted.

Market Street's motion in limine seeks to preclude the testimony of Brian Krason, one of Krantz's expert witnesses, on four matters. First, Market Street moves to preclude Krason's testimony on medical causation, as Krason's lack of any medical expertise makes him unqualified to offer medical testimony about Krantz's injuries.[18] Krantz agrees and states that he never intended to offer any such expert testimony from Krason in the first place; "Plaintiff is relying on actual medical experts for this purpose."[19] Therefore, Market Street's motion in limine is granted as to Krason's testimony on medical causation.

---

[15]   Krantz Motion in Limine, Doc. 61 ¶¶ 4-5.

[16]   *Id.* ¶10.

[17]   Market Street Investment Corporation Brief in Opposition, Doc. 63 at 1.

[18]   Market Street Investment Corporation's Motion in Limine, Doc. 59 ¶6.

[19]   Krantz's Brief in Opposition, Doc. 64 at 3.

Market Street's motion in limine also moves "to preclude Krason from offering opinions and/or testimony regarding tempered safety glass; adequacy of inspections; [and] the condition of the subject window."[20]

The parties do not dispute Krason's qualifications. Krason has forty years of experience in the real estate and property management field, and "practical experience, even without relevant formal education, can be enough to qualify a witness as an expert."[21] Krason's real estate and property management experience give him "skill or knowledge greater than the average layman" that is relevant to the issue of property management, so Krason is qualified to be an expert.[22]

The main issue is reliability. Expert testimony need not have "the best foundation, or even . . . [be] supported by the best methodology or unassailable research."[23] But "[t]o ensure that the [expert's] criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process . . . there must be a scientific method of weighting that is used and explained.'"[24]

---

[20]   Market Street Investment Corporation Motion in Limine, Doc. 59 ¶6.

[21]   *Whyte*, 514 F.Supp. at 693 n.3.

[22]   *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (cleaned up).

[23]   *UGI Sunbury*, 949 F.3d at 834.

[24]   *In re: Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017) (quoting *Magistrini v. One Hour Martinizing Dry Cleaning*, 68 F.App'x 356, 607 (3d Cir. 2003)); *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48 (3d Cir. 2008)) (listing eight factors traditionally used to evaluate the reliability of expert testimony).

The reliability of an expert witness's methodology is typically evaluated based on eight factors.[25] But "there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it."[26] "Many factors of the *Daubert* reliability test are not applicable when a non-scientific expert's methodology is being scrutinized,"[27] because the reliability of testimony from a practical experience expert "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."[28]

This does not mean that anything goes when an expert testifies based on training and experience. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[29] "When an expert relies 'solely or primarily on experience,' he must explain 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and

---

[25] *See Elcock*, 233 F.3d at 745-46 ("(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.") (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994)).

[26] *Oddi*, 234 F.3d at 158.

[27] *Equinox Properties, LLC*, No. 21-cv-15929 (RBK/AMD), 2023 U.S. Dist. LEXIS 148946, at *4 (D.N.J. Aug. 24, 2023).

[28] *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

[29] *G.E. v. Joiner*, 522 U.S. 136, 146 (1997).

how that experience is reliably applied to the facts."[30] "The gate-keeping function of the trial court requires more than merely 'taking the expert's word for it.'"[31]

### A.    Adequacy of Keystone COG's Inspection

Defendants object to the following observations in Krason's report:

5. The failure by Defendants to properly inspect the window where Mr. Krantz was injured was a reckless disregard for the safety of the tenants and guests and indicates the complete disconnect between the Defendants' duties for safe property maintenance and their actual actions in ensuring safety of tenants and guests.

15. Scott Stieler and Market Street Investments Corporation violated common and acceptable industry standards and good practices by believing that the COG inspection was a thorough property inspection which caused a condition to exist causing Drew Krantz's injuries. [32]

Here, Krason's opinion is inadmissible as expert testimony because it does not assist the trier of fact. Krason's opinion is simply based on a quotation from Keystone COG's website,[33] and on the contents of the International Property Maintenance Code (IPMC) inspection checklist which may or may not have been used by Keystone COG.[34] Krason's report highlights language from Keystone COG's website, stating that "[t]he inspection is limited to observations readily visible without moving or removing any item" and that Keystone COG performs a

---

[30]   *In re Lincoln Nat'l COI Litig.*, 620 F.Supp. 3d 230, 244 (E.D. Pa. 2022) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendment); *see also Whyte*, 514 F.Supp. 3d at 695-96 (expert conclusions excluded where he provided no explanation of how he applied experience or methodology to facts of the case).

[31]   *Brown v. Wal-Mart Stores, Inc.*, 402 F.Supp. 2d 303, 308 (D. Me. 2005) (quoting Fed. R. Evid. 702 advisory committee's note).

[32]   Krason Report, Doc. 59-1 at 12.

[33]   *Id.* at 7-8.

[34]   Krason Dep., Doc. 59-3 at 61:18—62:7; 63:13-19, 68:9-23.

"minimum property maintenance inspection."[35] In opining on the IPMC checklist, Krason's reasoning is that because the IPMC checklist does not include any window inspection beyond ensuring that the windows can open and close, any inspector using the IPMC checklist did not inspect windows beyond ensuring that they can open and close.[36]

Both opinions are facially apparent from reading Keystone COG's website and IPMC checklist themselves; they are based on simple intuition.[37] Laymen or property management experts are equally competent to make these observations, and therefore admitting them as expert testimony has the potential of misleading the jury.[38] Simply reading Keystone COG's website and inspection checklist requires no specialized knowledge.[39]

Krason also testifies that based on his extensive experience working with inspectors in the city of *Philadelphia*, such inspectors do not check the windows other than ensuring that they can be opened for emergency egress.[40] But Krason

---

[35]    Krason Report, Doc. 59-1 at 7-8.

[36]    *See id.* at 68:9-16; *see also* Exhibits to Krason Deposition, Doc. 59-3 at 128.

[37]    *See Fedor v. Freightliner*, 193 F.Supp. 3d 820, 832 (E.D. Pa. 2002) (rejecting expert opinions "based solely on intuition" and "generalized common sense").

[38]    *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021) (observing that because "expert evidence can be both powerful and misleading," "the importance of the gatekeeping function cannot be overstated") (quoting *Daubert*,509 U.S. at 592).

[39]    *See United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019) ("If the matter is within the jurors' understanding, the expert testimony is not 'specialized knowledge' that will 'help the trier of fact.'"); *LG Electronics v. Whirlpool Corp.*, No. 08-C-242, 2010 U.S. Dist. LEXIS 91739, at *17 (N.D. Ill. Sep. 3, 2010) ("[S]imply reading these articles does not require any specialized knowledge or skill.").

[40]    *See* Krason Dep., Doc. 59-3 at 68:12—69:5.

admits that he has no knowledge or experience which would bear upon whether the inspectors in Lewisburg would inspect windows, beyond what is gleaned from Keystone COG's website and inspection checklist.[41] Applying Krason's testimony about Philadelphia inspectors is then based on insufficient facts and data;[42] it is speculative and not reliably applied to the facts of this case.

Even assuming that Krason's experience working with inspectors "up and down the east coast" using the IPMC checklist[43] could provide a reliable, experience-based foundation for him to understand whether inspectors utilizing this checklist in Lewisburg would adequately inspect windows, Krason's opinion remains speculative and based on insufficient facts and data. Krason admits that he does not even know whether the Keystone COG inspection conducted at the property relied upon the IPMC checklist:

> Q. It's a two-page document, and it's entitled International Property Maintenance Code, IPMC, Pre-Inspection Checklist. Is this referenced in your report anywhere?

> A. Yeah. I believe, if I remember correctly, that the landlord had his unit inspected by The Keystone COG.

> Q. Okay. Is this the form they used, to your understanding?

> A. I don't know if it's the exact form, but it is a form.

---

41   *See id.* at 65:13—69:5.

42   *See* Fed. R. Evid. 702(b); *Casper v. SMG*, 389 F.Supp.2d 618, 623 (D.N.J. 2005) ("[E]xpert testimony [is] inadmissible where [the] expert's 'opinion is purely speculative, and not supported by a reliable foundation.'") (quoting *Am. Marine Rail NJ, LLC v. City of Bayonne*, 289 F.Supp. 569, 589 (D.N.J. 2003)).

43   *See* Krason Dep., Doc. 59-3 at 69:3-5.

Q. What did you – did you reference this document in your report?

A. Yeah."[44]

Therefore, Krason's testimony that Keystone COG's inspection did not ensure that the windows were free of safety hazards is inadmissible. Of course, this does not prevent Krason from testifying about the frequency or intensity of inspections required for safe property management based on his own experience in the industry; it merely prevents him from rendering an expert opinion as to the thoroughness and contents of Keystone COG's inspection specifically, because this opinion is based almost solely upon the clearly observable contents of its website and the IPMC inspection checklist.

### B.   Tempered Safety Glass

Likewise, Krason opines that tempered glass is the industry standard for property managers. But because an industry standard describes generally accepted requirements, it cannot be reliably demonstrated by personal experience alone, even by a qualified and experienced expert. "Where plaintiff seeks to prove deviation from an industry standard . . . that standard must be shown through suitable industry-wide practice."[45]

---

[44] *Id.* at 61:18--62:7.

[45] *See Mendler v. Aztec Motel Corp.*, Civil No. 09-2136 (JBS/JS), 2011 U.S. Dist. LEXIS 140928, at *4 (D.N.J. Dec. 7, 2011).

Krason states in his deposition that he personally tells landlords to replace windows with float glass, and that every apartment building he has managed has either installed tempered safety glass "over time, or there was a plan through a reserve study to replace those windows."[46] But this personal experience still does not justify expert testimony that installing tempered safety glass is a "best practice" in the property management industry; it only speaks to Krason's own practice.

When asked if any code requirements would mandate replacing the float glass used in the residence, Krason states that "it's a nonregulated business, so there are no particular codes."[47] And, Krason admitted that he is not aware of "any building codes anywhere that require tempered safety glass in apartment buildings;"[48] that he has no "sense for how many apartment units use tempered safety glass versus how many don't;"[49] that the organizations referenced in his report make no direct comment on whether using tempered safety glass is an industry standard;[50] that these organizations promulgated no specific standard or recommendation that windows in apartment units should only employ tempered safety glass;[51] and that he cannot point to a single authoritative source that says that regular glass should not be used in windows in apartment buildings.[52]

---

[46] Krason Dep., Doc. 59-3 at 61:3-7.
[47] *Id.* at 60:21-22.
[48] *Id.* at 60:23—61:2.
[49] *Id.* at 65:2-5.
[50] *Id.* at 83:9-13.
[51] *Id.* at 84:5-9.
[52] *Id.* at 85:8-11.

Conceding that he is aware of no source opining on the merits of float glass or tempered safety glass at all, Krason contends that he has nevertheless supported his opinion with industry standards, but states: "[t]he only standard would be that they [the windows] have to be safe."[53] That conclusory "standard" neither requires technical knowledge nor assists the fact-finder. The issue in need of support is not whether windows must be safe; it is what conditions render them safe. Krason skips the important step: explaining the basis on which he concludes that tempered safety glass is the industry standard for property managers.

Any testimony Krason may offer that tempered safety glass is an industry standard among property managers is therefore unreliable. Krason may not testify that tempered safety glass is the industry standard. That does not, however, prevent him from testifying that safety glass is safer than float glass.

### C.    Condition of Windows

Market Street contests the following conclusion in Krason's report: "The window at 220 South 7th Street, Lewisburg exhibited signs of inadequate maintenance, including dry rotting framing and allowed the dangerous condition to exist causing Mr. Krantz's injury."[54]

---

[53]  *Id.* at 84:5-10.
[54]  Krason Report, Doc. 59-1 at 10.

This Court faced a similar expert testimony issue in *States v. Fernwood Hotel & Resort*.[55] The plaintiff in *States* was a patron in a restaurant enclosed in a "greenhouse-like structure, with double pane glass windows comprising the walls and the roof."[56] He sued for negligence when a falling pane of glass hit his head, and his expert witness, who had worked in the glass business for thirty-nine years, supported his opinion with extensive and closely relevant experience: the expert had worked as a glazier, had run companies engaged in glass installation, had attended annual classes in the glass field, had overseen and troubleshooted glass installation projects, had worked with glass and similar greenhouse structures, and had trained over 200 apprentice glaziers.[57]

That expert's report analyzed photographs of the scene of the accident, witness depositions, and the plaintiff's medical records.[58] He determined that the glass had not been properly maintained, and that the glass was "abused by drilling holes, hanging chains and hooks, a bar attached to the structure, leaking thermos seals, temperature fluctuations and a lack of maintenance, and that this abuse weakened the structure, causing the glass pane to fall."[59]

Sitting by designation in the Middle District of Pennsylvania, Judge Joel H. Slomsky explained that "many of the factors" traditionally relied upon to gauge

---

[55]   2014 U.S. Dist. LEXIS 4997.
[56]   *Id.* at *1-2.
[57]   *Id.*
[58]   *Id.* at *4.
[59]   *Id.* at *3-4

reliability in this Circuit, "peer review, publication, potential rate of error, general acceptance, standards controlling the technique's operation, and the relationship of the technique to reliable methods—do not apply" to the expert's testimony.[60] Instead, the Court looked to two factors: the expert's "qualifications and the non-judicial uses to which his opinions had been put."[61] The *States* court explained that the expert "rendered his opinion after a careful review of the evidence," supported "by his understanding of glass products" based on his extensive career experience.[62] The Court was further "impressed" by the expert's experience with the kind of glass at issue in the case, his experience with the greenhouse-like structures at issue in the case, and with the fact that his opinions had been requested in the non-judicial context when he was brought on as a consultant for glasswork in homes and offices.[63]

It is obvious that Krason's expert report alone is insufficient to render his opinion reliable; he delivers no explanation of his experience inspecting windows or of how he applied that experience to determine that this window was unsafe because it was improperly maintained.

However, Krason's deposition testimony fills these gaps, demonstrating his relevant experience, the non-judicial contexts in which he has evaluated the safety

---

[60] *Id.* at *9.
[61] *Id.*
[62] *Id.* at *9
[63] *Id.* at *10.

of residential windows, and his explanation as to how improper maintenance contributed to the accident. Krason has experience in the construction management of small projects including window replacements,[64] he was a member of the Institute of Real Estate Management for more than ten years,[65] and he has worked closely with many building inspectors in his capacity as a property manager.[66] Krason also developed a lengthy checklist of items to inspect in an apartment,[67] used by himself and his managers.[68] And like the expert in *States*, Krason has put his inspection expertise to non-judicial uses during his long career. In the course of his 43 years as a property manager in commercial and residential contexts,[69] Krason had occasion to inspect properties, recommend repairs, review the conditions of windows and their safety, and recommend the replacement or repair of windows when he deemed them unsafe.[70]

While Krason's experience is certainly less specialized than that of the glass expert in *States*, his 43 years of experience do encompass identifying unsafe windows in residential apartments, and that experience is therefore still sufficiently specialized under Rule 702.[71] Krason has applied his experience and provided an

---

[64] Doc. 59-3 at 8:21-13
[65] *Id.* at 44:12-16.
[66] *Id.* at 67:11-12, 68:18-19, 69:3-4.
[67] *Id.* at 62:16-17.
[68] *Id.* at 53:2-17.
[69] Doc. 59-2.
[70] *Id.* at 97:1-16.
[71] *See Lauria v. AMTRAK*, 145 F.3d 593, 599 (3d Cir. 1988) (In negligence case against railroad where plaintiff injured himself after tripping over wood near dimly lit track, former

explanation of how he identified that these windows were improperly maintained and unsafe. Analyzing several pictures of the windows, Krason explains that several gaps in the wood indicate that the window frame is rotted, most observably at the corners.[72] This rot increased the gap in the wood around the window glass, allowing the window frame to "shimmy" and contributing to the glass eventually breaking and causing Krantz's injury.[73] Krason's experience and explanation are sufficient for the Court to conclude that he is applying a reliable experience-based methodology to his conclusions regarding the condition of the window, based on a preponderance of the evidence.

Although Market Street contends that Krason has not applied any methodology in its brief,[74] Market Street does not otherwise explicitly object to Krason's methodology for evaluating the condition of the window.[75] Instead, Market Street mainly argues that he has not reliably applied his methodology to the facts of this case.

---

foreman's testimony on required precautions was sufficiently specialized "given [foreman's] twenty years of experience in track maintenance, operations, and safety, and given the nature of his opinion and the liberal standard by which we interpret reliability under Rule 702.").

[72]  Krason Dep., Doc. 59-3 at 64:9-18; 76:16-18; 78:8—82:1; 98:21—99:7.

[73]  *Id.* at 79:21—80:21; 98:21—99:7; 100:9-17.

[74]  *See* Market Street Investment Corporation Brief in Support, Doc. 60 at 12 ("Krason's opinion as to the condition of the window and that rot was present, is not based on any personal inspection of the window, or any other viable methodology.").

[75]  *See Mornan*, 413 F.3d at 380 ("Deference to the trial judge is particularly warranted where the defendant does not object to the admissibility of the expert's testimony . . . . Where the opposing party does not sufficiently call these issues into question, we will not find plain error merely because the District Court did not conduct an extensive Daubert analysis on the record.").

First, Market Street objects that because Krason equivocated on his views during his deposition, he has unreliably applied his methodology for inspecting the condition of windows to the facts of this case. Specifically, Krason testified several times that he saw "what appears to be rot" on the window frame.[76] Krason also "guesstimated" that the gap caused by rot in the window corners was about an eighth of an inch, which "means that the glass can now move and shimmy," creating a dangerous condition.[77] Finally, in describing the window frame visible in one specific photograph, Krason states: "the side needs to be – I can't tell if it's rot, but the paint is chipped."[78]

In sum, Krason's testimony is that a gap in the window framing, likely caused by rot, allowed the glass to move and contributed to Krantz's accident. Whether or not the gap was caused by rot, and whether or not Krason's "guesstimation" as to the gap's size is slightly too large or small, his testimony is the same; allowing the gap to persist created an unsafe condition.

Krason's minor equivocations over the rot and size of the gap do not render that testimony unreliable in any event. Proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . The evidentiary

---

[76] *See* Doc. 59-1 at 14:10-13; 76:15-18.
[77] *Id.* at 100:9-17.
[78] *Id.* at 80:15-16.

requirement of reliability is lower than the merits standard of correctness."[79] For that reason, "[e]xpert witnesses need not be subjectively certain or totally convinced about their opinions for the testimony to be admissible."[80]

In *United States v. Mornan*, for example, a handwriting expert was asked on cross-examination whether her opinions were rendered to "a reasonable degree of scientific certainty," and the District Court properly admitted her testimony even though the expert responded, "I think they are."[81]  In contrast, while it is true that expert witness testimony based on mere speculation is inadmissible, expert opinions are only speculative where they lack factual basis or reasoning.[82] Here, Krason's mild uncertainty is no different from that of the handwriting expert in *Mornan*. His opinion is not undermined by a lack of information, and it is not undermined by a failure to articulate any reasoning. So Krason's opinion is not unreliable due to these cherry-picked deposition quotations.

Market Street also objects that Krason's report is based off insufficient facts or data[83] because Krason does not know when, or by whom, the photographs of the

---

[79]  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). *See United States ex rel. Druding v. Druding*, 952 F.3d 89, 98 (3d Cir. 2020) ("The 'reliability and believability of expert testimony . . . is exclusively for the jury to decide.'") (quoting *United States v. Paulus*, 894 F.3d 267, 277 (3d Cir. 2018)).

[80]  4 WEINSTEIN'S FEDERAL EVIDENCE § 702.05.

[81]  413 F.3d 372, 380-81 (3d Cir. 2005).

[82]  *See, e.g.*, *Ucciardi v. E.I. Du Pont Nemours & Co.*, Civ. No. 13-4952, 2016 U.S. Dist. LEXIS 174715, at *5 (D.N.J. Dec. 19, 2016); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

[83]  Fed. R. Evid. 702(b).

window were taken.[84] But the photographs were obviously taken after the accident and before the window was repaired; they show that the glass is still broken.[85] So these objections are also without merit.

### D.    Prior Expert Witness Testimony

Federal Rule of Civil Procedure 26(a)(2)(B)(v) provides that an expert witness's report "must contain . . . a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

In his deposition, Krason directly states that he does not have a list of cases in which he has testified, despite testifying "10 to 20 times" at trial and "25, 30" times in depositions.[86] But Krason also states that "[w]ith COVID, I have not testified in [the last] five years;" Krantz's counsel stated in the deposition that "[i]f there are any [cases in which Krason has testified in the last four years], "we'll put that together and get that to you."[87] In a footnote to Market Street's Brief in Support, it states that it "has not yet been provided with a copy of Mr. Krason's

---

84    Market Street Investment Corporation's Brief in Support, Doc. 60 at 12.
85    *See* Exhibits to Krason Dep., Doc. 59-3 at 131-149.
86    Doc. 59-3 at 26:24—27:20
87    Doc. 59-3 at 31:7-18.

testimony history pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v), despite repeated requests for the information."[88] Krantz provides no response to this statement in its Brief in Opposition.[89]

Even though Krason's CV states that he "offer[s] Premises Liability Opinions" and is "experienced in depositions and being questioned on the stand in front of a jury,"[90] Krason makes no statement in his expert report that he has not testified in any cases within the last four years. Nor, apparently, has Krantz's counsel confirmed this fact to Market Street, at least as of the time that Market Street filed its motion in limine. Although there would ordinarily be no cause for the Court to raise this issue sua sponte, Market Street's briefing and Krason's deposition testimony show that Krantz has failed to verify Krason's case history, or lack thereof, to Market Street.

Accordingly, Krantz must either provide a list of the matters in which Krason has testified within the last four years, or else certify to Market Street that he has not testified in any matters within the last four years, within seven days from the date of this Memorandum Opinion and Order. If Krantz fails to do so, this may provide grounds for Krason's testimony to be excluded in full.

---

[88]   Market Street Investment Corporation Brief in Support, Doc. 60 at 2 n.2.
[89]   *See generally* Krantz Brief in Opposition, Doc. 64.
[90]   Doc. 59-2.

## IV.   CONCLUSION

Krantz's motion in limine is granted in full, and Market Street's motion in limine is granted in part and denied in part. Krason may testify as to his opinion that the window at issue was in poor condition, but he may not offer expert testimony that tempered safety glass is an "industry standard" among property managers or that Keystone COG's inspection did not reach the windows. Additionally, Krantz must either provide to Market Street a list of the matters in which Krason has testified within the last four years, or else verify that Krason has not so testified, within seven days.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge